## GEORGE U. GRAFF vs. THE MAYOR AND CITY COUNCIL OF BALTIMORE.

An act of Assembly for supplying the city of Baltimore with pure water, authorised, in order to the condemnation of land for that purpose, a jury to be summoned and sworn, "to inquire into, assess and ascertain the sum or sums of money to be paid by" the city authorities, for the property "which they may *deem necessary* to purchase and hold or use for the purpose," whose inquisition shall be returned to the clerk of the circuit court of the county where the property is situated, and "*shall be confirmed* by said court at its next session, if no sufficient cause to the contrary be shown, and such inquisition shall describe the property *taken,* or the bounds of the land condemned, and the quantity or duration of the interest in the same valued to

the" city, "*and such valuation when paid or tendered to the owner or owners of*" the property, "*shall entitle*" the city "to the *use, estate* and *interest* in the same thus valued as fully as if it had been conveyed by the owner or owners." Under this act an inquisition was taken and duly *confirmed* by the proper court, valuing the damages to the appellant, for the taking and use of his property at $30,000, but the city before *payment* or *tender* of this sum, *abandoned* the design to use the property, and *refused to pay* the amount so awarded, and upon appeal from an order refusing a *mandamus* to compel such payment, HELD,

1st. That the judgment of confirmation *decides* the value of the land, from which there is *no appeal* directly to the appellate court, and consequently its propriety cannot be inquired into in this collateral way.

2nd. That the city is *not bound* by the mere inquisition and judgment of confirmation thereon, and could rightfully *abandon* the location in question; *payment* or *tender* of the *valuation* is necessary to give the city *title* to the property.

3rd. That the city may be made liable, in another form of proceeding, to the appellant, for any loss or damage he may have sustained by reason of the conduct of its authorities in the premises.

APPEAL from the Superior Court of Baltimore city.

By the act of 1853, ch. 376, entitled, "An act for supplying the city of Baltimore with pure water," power is given to the Mayor and City Council of Baltimore to "agree with the owner or owners of any land, real estate, spring, brook, water or water-course, earth, timber, stone or other materials, which the said Mayor and City Council of Baltimore may conceive expedient or necessary to purchase and hold, for the purpose of introducing water into the said city," and if they cannot so agree, provision is made for summoning a jury "to inquire into, assess and ascertain the sum or sums of money to be paid by the said Mayor and City Council of Baltimore, for the land, spring, brook, water-rights, or other property, which they may deem necessary to purchase and hold, or use for the purpose;" such jury, to be sworn justly and impartially, to value the damages which the owner will sustain, by such use and occupation of his property, to reduce their inquisition to writing, and sign and seal the same, which shall then be returned to the clerk of the circuit court for the county where the land is situated, and filed in his office; "and shall be *confirmed* by said court at its next session, if no sufficient cause to the contrary

be shown, and when confirmed shall be recorded; and such
inquisition shall describe the property taken, or the bounds of
the land condemned, and the quantity or duration of the in-
terest in the same, valued to the Mayor and City Council of
Baltimore, *and such valuation, when paid or tendered to the
owner or owners* of said property, or his, her or their legal rep-
resentatives, *shall entitle the said Mayor and City Council of
Baltimore, to the use, estate and interest in the same, thus
valued, as fully as if it had been conveyed by the owner or
owners of the same.*" The act then provides, that the city
authorities shall have power to issue certificates of debt, to the
limit of $2,000,000, to defray the expenses of this improvement.

Under this law an ordinance was passed by the city authori-
ties, in July 1856, adopting a plan for the introduction of wa-
ter into the city, by the way of Stony Run. A portion of
the land embraced in this plan, belonged to Graff the appel-
lant, and was situated in Baltimore county; notice was given
to him by the proper agent of the city, to stop the improve-
ments thereon, which he was engaged in making, and that the
city would forthwith take the proper steps to summon a jury
to value the property, and would object to the valuation of
any work or improvements he might thereafter put thereon.
A jury was then summoned under the law, made an inquisi-
tion, assessing the damages to the appellant at $30,000, which
was duly returned to the clerk of the circuit court for Balti-
more county. This court passed an order confirming the in-
quisition *nisi*, after which the city passed an ordinance repeal-
ing the previous ordinance adopting this plan, and directing
their counsellor to resist the confirmation of any and all inqui-
sitions which have been had thereunder, who thereupon
showed cause against the confirmation of the present inquisi-
tion, alleging that Graff had no right to demand confirmation
thereof, and that the city does not desire to have it confirmed,
and has made no application for that purpose, but, on the con-
trary, has abandoned all design and intention to use and oc-
cupy the land, and has disclaimed all right, title and demand
thereto. But the court, (PRICE, J.,) after full argument on
both sides, ordered the inquisition to be ratified and confirmed.

Graff then demanded from the city authorities, payment of the sum awarded to him by this inquisition, which being refused, he then filed his petition in the superior court of Baltimore city, setting forth the above proceedings, alleging that he had thereby been put to great expense for counsel-fees and other necessary charges, and was and is greatly disturbed and injured in his possession and enjoyment of the said land and charging that, by this inquisition, and confirmation thereof, it was conclusively adjudged that the said sum of $30,000 should be paid to the petitioner for his said property, by the Mayor and City Council of Baltimore; and praying for a *mandamus,* commanding the said Mayor and City Council, forthwith to provide or procure funds in manner according to law, for payment of this claim. The city authorities answered this petition, admitting the proceedings under the inquisition, but insisted, that by the act of 1853, ch. 376, power was given to the court to confirm it, only at the instance and upon motion of the respondents, whereas it was confirmed at the instance of Graff, and against the remonstrances of respondents, and the confirmation was, therefore, without power in the court, and a mere nullity. The answer then avers, that Graff has not been disturbed in the possession of his land, nor has he at any time offered to deliver possession of the same to respondents, nor does he intend, as they have heard, so to do, even on payment of the $30,000, but on the contrary intends to continue his possession, and to maintain the same upon the plea, that as the respondents have abandoned the scheme of using his property to convey water to the city, they have lost their power and capacity to acquire and hold the same; *that* before the confirmation of this inquisition, respondents, upon considerations of public interest and convenience, abandoned, as it was their duty to do, the expensive and inexpedient plan of conveying water to the city by the way of Stony Run, and disclaimed all intention of taking, using or condemning any land on said run, as appears by the ordinance passed for that purpose; *that,* upon the facts set forth in the petition, Graff has a remedy, if he has any rights, whatever, better adapted to the circumstances of his case, in a court of equity, than the one

he is now seeking by *mandamus;* and that the court, has no jurisdiction to issue the same.

The court, (LEE, J.,) passed an order discharging the rule which had been previously laid, and dismissing the petition, from which Graff appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON, TUCK and BARTOL, J.

*A. W. Machen and Wm. Schley,* for the appellant.

The act of 1853, ch. 376, gives a power, without limit or restriction as to necessity, to the city authorities to purchase and condemn lands for the purpose of introducing water into the city of Baltimore; in case of disagreement a jury is to ascertain the damages to *be paid* by the city; their inquisition, the act says, *shall be confirmed,* unless sufficient cause to the contrary be shown.  When, therefore, the land is condemned, the inquisition made, returned, and *confirmed,* it is a *taking* of the property by the city for its use; the land is then *taken* in the sense of this act for public use, and the obligation to pay becomes *fixed,* whether it be actually *used* for the specified purpose or not.  The finding of the jury in their inquisition, which must describe the property *taken* and its *confirmation* by the court, is a *conclusive* and *binding* act.  We therefore, upon all the proceedings in this case, insist:

1st. That the inquisition, confirmed as it has been by the circuit court, is a *final adjudication,* and conclusively establishes the appellant's right to the sum thereby ascertained and awarded.  (1 *Md. Rep.,* 567, *Hamilton vs. Annapolis & Elk Ridge Rail Road Co.,* and the same case in 1 *Md. Ch. Dec.,* 109; 8 *G. & J.,* 443, *Wil. & Susq. Rail Road Co., vs. Condon;* 8 *Md. Rep.,* 7, *Lammott vs. Maulsby;* 2 *H. & G.,* 50, *Raborg vs. Hammond;* 22 *Pick.* 263, *Harrington vs. Commissioners of Berkshire;* 21 *Do.,* 260, *Carpenter vs. Commissioners of Bristol;* 4 *Barb.,* 64, *People vs. Supervisors of Westchester;* 2 *Greenlf's Rep.,* 179, *Westbrook vs. North;* 4 *New Hamp.,* 517, *Hampton vs. Coffin;* 5 *Adol. & Ellis,* 814, *King vs. Thames & Isis. Nav. Co.;* 3

*Mylne & Craig*, 440, *Salmon vs. Randall; 9 Excheq. Rep.*, 402, *In Re Ware; 6 Gill*, 391, *Methodist Church vs. Mayor & C. C. of Balto.; 8 Do.*, 443, *Richardson vs. Mayor & C. C. of Balto.; 10 Pet.*, 449, *Voorhees vs. Bank of U. S.; 4 How.*, 404, *Stimpson vs. Westchester Rail Road Co.;*) and it is right it should be so, for it seems the appellant's claim to damages (and *some* damages he certainly has sustained,) is merged in this statutory remedy, and it would be unrighteous if the city, after bringing him before a jury, and taking the chance for a verdict more beneficial to itself, and then keeping him in suspense and fast bound up to the last moment, should have power to nullify a judgment of its own seeking. 3 *Metcalf.*, 381, *Dodge vs. Commissioners of Essex.* 2 *Eng. Railway Cases*, 1, *Queen vs. North Midland Railway.* 19 *Barb.*, 263, *Turrell vs. Norman.* 15 *Eng. Law & Eq. Rep.*, 368, *Hawkes vs. Eastern Counties Railway Co.*, and the same case in the House of Lords, 35 *Eng. Law & Eq. Rep.*, 19, 22, 28.

2nd. That the city's *abandonment* of the property can have no effect upon the present question, because: 1st, it took place while the inquisition was pending in the circuit court and that tribunal has *finally adjudicated* upon its operation; the point is not *now* open; 2nd, in the case of an inquisition regularly confirmed, though the city may relinquish the right to use the condemned property, it cannot open the *settled* question of damages, or deny the obligation of the judgment in so far as it works against itself. If the city changed its plan it was not the appellant's *fault*, and the consequences cannot be thrown upon him. The inquisition was a valid contract between the parties, and the city had *no right to recede;* the law requires that it *shall be confirmed* unless sufficient cause be shown, and it was the imperative duty of the court *to confirm it.* 73 *Eng. C. L. Rep.*, 755, *Macdougall vs. Patterson.* And upon this point in addition to the cases already cited, see 2 *Gill*, 20, *Balto. & Susq. Rail Road Co. vs. Compton.* 11 *G. & J.*, 404, *Ches. & Ohio Canal Co. vs. Grove.*

3rd. The city having once set in motion the machinery provided by the act of Assembly, and formally declared its pur-

pose of taking the land, could not evade the obligation of compensation, but may be compelled by *mandamus* to proceed. 4 *Barn. & Adol.*, 327, *King vs. Hungerford Market Co.* *Ibid*, 333, *King vs. Commissioners of Market Manchester*, note. 6 *Hare*, 594, *Walker vs. Eastern Counties Railway Co.* 4 *Eng. Railway Cases*, 615, *Tawney vs. Lynn & Ely Railway.* 1 *Do.*, 400, *Stone vs. Commercial Railway.* 69 *Eng. C. L. Rep.*, 1043, *Queen vs. South Devon Railway Co. A fortiori*, is it not competent to the city to refuse payment after the claim to damages has passed into judgment. Notwithstanding its character as a municipal corporation, the city of Baltimore stands just like any private corporation, when, in the exercise of a statutory power, it is appropriating to the use of its citizens, lands lying outside of its corporate jurisdiction. 3 *Hill*, 538, *Bailey vs. Mayor &c. of New York.*

*H. R. Dulany and G. L. Dulany*, for the appellees.

Each case like the present must depend upon the construction of the *particular* act of Assembly, giving the power. The mode of taking land in England for public use is entirely different from that which prevails with us, and hence the English authorities cited by the counsel for the appellant are wholly inapplicable to the present case. The American cases, cited by them, only establish the principle, which we admit, and which is conclusive of this case, that *when* the title to the land is vested in the public, *then* the right of the owner to his damages becomes vested, and *not till then.* The inquisition in this case, and its confirmation, do not constitute a judgment *to pay*, but is simply a condemnation of the land for *future use*, an assessment of damages for *future loss*, and *future injuries.* The constitution of our State entitles a party to compensation whenever his land is *taken* for public use; it is the *taking* of his land which gives him the right to compensation; whenever the *title* is fixed in the public, the correlative right of the owner to damages is fixed. Now when, under this law, was the *title* to this land to become vested in the city? The answer is plain from the language of the act: "*such valuation*," (fixed by the inquisition and its confirmation)

"*when paid or tendered to the owner,*" shall "*entitle*" the city to the *use* of the land, as fully as if conveyed by the owner. Actual *payment* or *tender* of the valuation fixed by the inquisition must precede the vesting of the title in the city, and until then the title is in the owner. In the case of *Susq. Rail Road Co. vs. Nesbit,* 10 *How.,* 395, in construing an act of Assembly similar to this, the Supreme Court decide this *very question.* See also, 7 *Md. Rep.,* 516, *Steuart vs. Mayor & C. C. of Balto.* We insist then:

1st. That the question, whether the corporation of Baltimore is liable or not, depends upon the true construction of the act of 1853, ch. 376, on the general principle, that whenever a special power is conferred by law, all questions which arise concerning the extent or the obligations to be incurred in the exercise of such power, must be determined by reference to the provisions of the law from which it emanates.

2nd. That this law, inasmuch as it clothes with authority a great public corporation for the purpose of enabling it to accomplish an object highly beneficial to the whole community, should be most liberally construed, and that the presumption of law is strongly against the supposition, that the power thus vested will be perverted for purposes of oppression. 21 *Conn.,* 306, *Bradley vs. New York & New Haven Rail Road Co.*

3rd. That, according to the proper interpretation of the act in question, a *locus pœnitentiæ* remains to the city, until money, awarded by the jury, is *actually paid* or *tendered* to the owner of the property which it may desire to take.

*Note.* The argument upon the question, whether *mandamus* is the proper *remedy* in such a case, is omitted, as the decision is adverse to the appellant on the question *of right.*

TUCK, J., delivered the opinion of this court.

This record presents two propositions for our consideration: the right of the appellant to the money claimed, and the propriety of the remedy employed.

Upon the *first* we agree with the appellee's counsel, that the case of the *Balto. & Susq. Rail Road Company vs. Nesbit,* 10 *Howard,* 395, is decisive of the present appeal, if we are

to recognize that decision as authority. The charter of that company, (1827, ch. 72,) as far as concerns the present inquiry, is substantially the same with the act under which the claim of the appellant is now made. Why different constructions should be placed upon them we do not perceive. If the title to the land condemned under the first of these laws did not vest in the company, because the valuation had not been paid or tendered, it follows, that such payment or tender was necessary to give title to the city of Baltimore in the property of the appellant. The court say: "It can hardly be questioned that, without acceptance by the acts and in the mode prescribed, the company were not bound; that if they had been dissatisfied with the estimate placed upon the land, or could have procured a more eligible site for the location of their road, they would have been at liberty, before such acceptance, wholly to renounce the inquisition. The proprietors of the land could have no authority to coerce the company into its adoption. This being the case there could, up to this point, be no mutuality, and hence no contract, even in the constrained and compulsory character in which it was created and imposed upon the proprietors by the authority of the statute." And, in another part of the opinion these terms are called "conditions indispensable to the vesting of a title in the company."

Now, if the title does not vest in the city until payment or tender, and the owner could compel payment by legal process, there would be no mutuality. The city might be required to pay for land that it may never use or need for the purposes of the act. This certainly would be a hardship on the citizens of Baltimore, from which, we think, they should be relieved by adopting the interpretation of the Supreme Court in the case cited.

This may be a severe system of legislation, as was said, because it places the property owner at the discretion, not to say caprice, of the other party, by allowing it to condemn and afterwards abandon the property. But this construction is not likely to work so much injustice as that contended for by the appellant, because, by the latter, the city is deprived of all choice of another location, after a condemnation is once made

and affirmed, no matter how great the necessity might be afterwards for adopting another, even if the owner of the land condemned had not sustained any damage by the act of the city in making the condemnation. These inquisitions, too, often tax the corporation beyond the value of the land, or the damages sustained, and the only relief it has against such wrong is to decline taking the land; of this the owner cannot complain. In cases, however, where the owner has suffered loss by the acts or delay of the corporation, redress might be had in another way. 3 *Bland,* 386. And this is an advantage which he has over the other party. If the property be used and occupied without payment or tender, the case would stand on a different principle, independent altogether of the valuation, as the basis of recovery, for although the State may authorize the condemnation of private property for public use and convenience, those who are clothed with the power are not to exercise it capriciously, or so as to inflict wrong on the citizen who may be called on to submit to this high power. *Moale vs. City of Balto.,* 5 *Md. Rep.,* 314.

The inquisition allows the owner such "damages as he will sustain by the taking, use and occupation" of the premises, and this is in pursuance of the oath which the law requires to be administered to the jury. The clause, authorizing the condemnation, implies, that the city should have an election to take or reject the property, after the condemnation, in requiring the jury to ascertain and assess the sum or sums of money to be paid by the Mayor and City Council, &c., "for the land, spring, brook, or water-right, or other property *which they may deem necessary to purchase and hold, or use for the purpose.*"

This means, necessarily, a purchase after the inquisition, by payment or tender of the valuation of the jury, because a previous agreement with the owner, would render the functions of a jury altogether unnecessary, and involves the power to reject the location altogether. The entry for purposes of condemnation is not a taking, use and occupation, within the meaning of the act, and, as we have seen, does not devest the owner's title, or confer it on the city. The act of Assembly has not made the inquisition and confirmation obligatory on

70   v.10

the city; further than this, that they ascertain the damages to be paid. If there be injustice in this, as alleged in the present case, the fault is in the law, and not to be imputed to those who administer it.

Our conclusions are: 1st, that the judgment of confirmation decides the value of the land, from which there is no appeal directly to this court; and, consequently, its propriety cannot be inquired into in this collateral way. 2nd, that the city is not bound by the mere inquisition and judgment thereon, and could rightfully abandon the location in question; and 3rd, that the city may be made liable, in another form of proceeding, to the appellant for any loss or damage he may have sustained by reason of the conduct of its authorities in the premises.

For as much as the appellant has no right to the amount in dispute, on the basis of the inquisition, we need not consider the questions propounded as to the remedy.

*Order affirmed.*