ELISE WILLIAMS *v.* NEW ORLEANS, MOBILE AND TEXAS RAIL-
ROAD COMPANY.

1. EMINENT DOMAIN. *Condemnation for railroad company. Compensation
claimed. Res inter alios acta. Case in judgment.*
The trustees in the first mortgage given by the N. O., M. & C. R. R. Co. took
possession of the road, in 1875, under a provision in the mortgage authorizing
that course upon default in the payment of the bonds secured by the mort-
gage. In 1877, and while the road was in the possession, and under the con-
trol of the trustees, a proceeding was instituted in the name of the original
company (N. O., M. & C. R. R. Co.), for the condemnation of a piece of land
owned by W., for the right of way of the road, and for the location of a depot.
The proceedings were conducted in accordance with the provisions of the
company's charter; and a judgment was rendered condemning the land, and
fixing the compensation of the owner. Before the trustees took possession
of the road the name of the company had been changed to the " N. O., M. &
T. R. R. Co." The proceedings were conducted by the attorney for the rail-
road at that time, at the instance of one of the trustees, who had entire
control and management of the road as the agent of the bond-holders
protected by the mortgage. And the chief engineer of the road aided in the
proceedings by furnishing the necessary maps. In 1880, the road was sold to
its present owners under a decree of foreclosure of the mortgage referred to.
The road had used as a right of way a part of the land condemned for six
years before the condemnation, and continued to use it afterwards, but neg-
lected to pay or tender the damages awarded therefor; and in 1881, W. filed
a bill in chancery to compel such payment. It is contended for the defendant
that the condemnation proceedings were conducted by the original stock-
holders, after they had lost all right of property in, as well as possession of
the road, and after the corporation had assumed its present name (N. O., M.
& T. R. R. Co.); and that such proceedings were *res inter alios acta*, as to the
trustees and the purchasers under the decree of foreclosure, and constitute
neither an estoppel upon them, nor are receiveable in evidence against them.
*Held,* that the procurement of the condemnation of the land was not the act
of the original stockholders, but the act of those under whom the present
owners of the road claim.

2. SAME. *Judgment of condemnation. Rights of parties, how fixed.*
The judgment of confirmation of proceedings condemning land and assessing
damages therefor, in a case such as is above stated, does not fix absolutely the
right of the one party to the land condemned, nor the right of the other to the
damages awarded; but it is the payment or tender of payment on the one
side, and the yielding to a demand for possession on the other, which fixes
the respective rights of the parties as ascertained by the judgment.

3. SAME. *Failure to perform judgment of condemnation. Effect on rights of
parties.*
If, in such case, there has been no payment or tender of compensation, and no
disturbance of the owner's possession, the one party has acquired nothing, and

60 MISS. — 44.

the other lost nothing; except that if the owner has suffered any damage by reason of the proceedings, either in the conduct of them, or consequent upon them, as in the destruction of structures, or the digging of earth, in the one case, or the depreciation of values, the prevention of erections, the incurring of expense or change of plans and losses of sales, in the other, he is entitled to full compensation therefor, though not to the specific sum adjudged to him. But cases may arise where the condemning party will be estopped by some matter *in pais* from receding from the judgment rendered at his own instance; and this should, perhaps, always be the rule where it is impossible otherwise to fully compensate the owner.

4. SAME. *Neglect to perform judgment of condemnation. Rights of parties. Case in judgment.*

The railroad company mentioned in the case above stated, entered in 1870, upon that part of the land afterwards condemned for a right of way as stated, and continued to use the same after the condemnation in 1877 as before, up to 1881, without having in the meantime entered upon that part condemned for depot purposes. The entry of the railroad company upon that part used as a right of way was without license and as a trespasser, though probably not wilfully so; and the owner with full knowledge of all the facts permitted the trespass to continue for many years without taking any steps to prevent it. *Held,* that the owner is entitled to compensation for the land actually used by the railroad company, with the election to take the present value or the value at the time of the entry, with interest. And the railroad company may elect whether it will take all of the land condemned or relinquish its claim to more than that used as a right of way; and in the event the company shall elect to take the whole, the owner will have the right, in view of the long time that has elapsed, to take the sum assessed in 1877, with interest, or the present value.

5. SAME. *Compensation. Decree therefor, how enforced.*

In the case above stated, it is proper for the court below, after having rendered a decree in accordance with the opinion of this court, to retain the cause to enforce performance of its decree, if necessary, by execution or by an injunction restraining the railroad company from running its trains over the complainant's land until the decree has been complied with.

APPEAL from the Chancery Court of Harrison County.

Hon. GEORGE WOOD, Chancellor.

A statement of the case will be found in the opinion of the court.

*Ben Lane Posey,* for the appellant.

Only one question was seriously argued before the chancellor at the hearing, and that was the question (1) whether an easement or interest in lands could be acquired by a parol gift or contract; or (2) whether, assuming the fact that the

complainant alone, through her vendor, had made a parol gift of the right of way over her lands, to defendant's vendor, and defendant's vendor had entered upon said right of way, and erected valuable railroad structures upon it, complainant was equitably estopped by such parol gift or license from demanding compensation for her lands so taken by said defendant. It would be a sorry compliment to the chancellor to suppose that he could have committed so palpable an error as to decide affirmatively the first proposition, that an interest in lands could be acquired and vested by a parol gift or contract. It necessarily follows, then, that he decided affirmatively the second proposition, that a party may be equitably estopped by an estoppel *in pais* from asserting a legal or equitable title to land. I need not deny the correctness of this proposition when it is applied in a proper case and with proper limitations. But I hope to satisfy this court that the case in judgment is not a case of estoppel at all, and, if it were, that the estoppel could only extend to such assertion of complainant's rights as would operate as a fraud upon defendant's rights, acquired on the faith of complainant's conduct. The only evidence of Mrs. Garraway's license to the New Orleans, Mobile and Chattanooga Railroad Company to enter and occupy said right of way, is the depositions of the witnesses for the defendant. Two of them testify that about 1869 or 1870 they had a casual conversation with their neighbor, Mrs. Garraway, and she said it was her intention to give this railroad company a right of way over her lands. The third witness testifies the same as the other two, with this addition: that after the railroad company had come and had taken possession of the right of way, and had crossed and had angered Mrs. Garraway by its conduct in taking and trying to take her lands, she declared that she had given them (the railroad company) a right of way, and —— d——n them, they were trying to take her home or all her lands from her. These were only loose, casual conversations with her neighbors, perhaps in social confidence, not made to

or in the hearing of any officer or agent of the railroad company, and having none of the essential features or elements of a contract. A contract must be made by one person with another person directly, or through an agent. It cannot be made by mere hearsay, spoken to strangers or third persons. But there is not the slightest evidence that these casual remarks to her neighbors were ever communicated to the railroad company, or that it at all relied upon such a shallow foundation in making its entry and erections upon said land. It is ludicrous to say that a great business corporation, with capable officers, should base its conduct and its important rights upon such shifting sands as hearsay reports of the casual and social gossip between an old woman and her neighbors. So there is not a scintilla of evidence to prove a parol gift of such right of way or license from Mrs. Garraway to this railroad company. It was not a promise or a representation made to this railroad company or its agents. It was not even a promise at all. It was a mere declaration of a present willingness or intention to give this company such right of way in future, and by a formal contract that would make it effectual. Such contract she refused to make, and, in 1873, conveyed said lands to the complainant, Eliza Williams, and at the same time assigned to her the damages due for the taking of said right of way. This was an express declaration that the taking was without her consent, and that she claimed damages for the taking. This is utterly inconsistent with the assumption that she had given such right of way. But if this parol gift were established, what is its legal effect? A right of way over the land of another is an easement, and is an interest in land. It cannot be created by parol. A parol gift of such right operates only as a license. 1 Redf. on Rys. 219; 6 Hill, 161; 1 Dev. & B. 492; 4 Sandf. Ch. 73; 3 Kent's Com., sects. 452, 453; Cooley on Torts, 307–312; 50 Miss. 410; 8 Geo. 700. While this doctrine is firmly established, yet there are decisions which reach the same result by a different method. They do indirectly what they cannot

do directly. They do not hold that such a contract is valid to pass an interest in lands, because such a doctrine would directly overthrow the Statute of Frauds, but they hold that it is effectual as a license, and when acted on by the licensee, who puts valuable improvements on the land, the license becomes irrevocable, and the licensee can hold on indefinitely or forever to the land so built on by him. This doctrine has grown out of the overweening desire of courts of equity to help out of their difficulties those careless or foolish persons who had expended money upon void contracts,— to relieve such persons from the consequences of their folly,— and to do this they apply to the case the equitable doctrine of estoppel *in pais* — a convenient and beneficent doctrine, but inapplicable to this case. The application of this doctrine to this class of cases is a perversion of that doctrine of estoppel. Such cases lack essential and indispensable elements of estoppel. To make a basis of such estoppel, there must be a knowledge of a fact possessed by one and not possessed by the other. One must have been misled and deceived, to his injury, by the conduct of the other, upon which the injured person relied. In these cases there is no mistake of fact by either party. Nobody is misled or deceived. There is no confidence reposed or betrayed. I beg the careful consideration by this court, of the lucid and powerful discussion of this subject by Judge Cooley, which ought to put an end to the misapplication of the doctrine of equitable estoppel *in pais* to such cases. Cooley on Torts, 307–312. Defendant below set up a title by adverse possession. I insist that, even if the facts justified it, this corporation could not acquire a title to land in this manner. A corporation can acquire title to property only by the methods designated in its charter. Its charter provides only two methods of acquiring property : First, by contract with the owner ; second, by expropriation under its charter. These two specific methods exclude all other methods. But there is no evidence of adverse possession, but the strongest evidence of permissive possession. The answer declares that the New Orleans, Mobile and Chatta-

nooga Railroad Company entered on said lands, but before said entry the then owner, Mrs. Garraway, gave them the land. Their original entry was permissive, and the occupation that followed continued to be permissive. Again, in 1877–8 this same railroad company, which had, it seems, changed its name in Alabama but not in Mississippi, filed its proceeding *ad quod damnum*, before the judge of the Seventh Judicial Circuit, to condemn this right of way and other lands. This proceeding is filed by James S. Rayner, as president, and Roderick Seal, as attorney, who signs his name thereto as attorney " specially authorized " to institute that proceeding. The petition states, as the necessity for this proceeding, that the company were unable to contract or agree with Johanna Garraway and Eliza Williams, the owners of these lands. There was a direct disclaimer of title by this railroad company as late as 1878. This proceeding went to a decree of expropriation of these lands upon the single condition to be performed by the railroad company — payment or deposit of the damages assessed. This proceeding kept the owner of the lands, Mrs. Williams, in painful and embarrassing suspense. She was liable, at any time, to be turned out of her home. A cloud was thrown over her title which would deter others from buying it. This proceeding was an offer by the company to buy these lands, by a statutory privilege and method. When consummated it became an agreement to buy these lands at the price assessed. A railroad company cannot be allowed to vex the owners of lands with these proceedings, as an experiment, and to take or reject the lands, as they may find the assessed valuation satisfactory or otherwise. We might well claim that a specific performance of that contract should be enforced against this company. We pray for alternate relief, the specific performance of this contract as to all the lands, or compensation for the right of way actually taken. We do not insist on the former, but will be content with the latter. As to the right to an injunction in such case, see High on Inj., sect. 401 ; 7 Smed. & M. 568 ; 2 Johns. Ch. 162.

*Gaylord B. Clark*, for the appellee.

Statute of Limitations : The proof shows an exclusive possession and dominion over a portion of the Garraway lands for about twelve years before the bringing of the suit under claim of right and ownership as against Mrs. Garraway and all the world besides.   And the original company assumed to convey a fee in said lands and to hold the same as absolute owners. The Statute of Limitations is therefore pleaded by defendant as a bar to the claim either for the recovery of the land or to any claim for compensation.   It is shown by the testimony and the undenied and therefore admitted allegation of the answer, that as far back as 1868, or early in 1869, the New Orleans, Mobile and Chattanooga Railroad Company, defendants, predecessors and privies in title, assumed an attitude in reference to said property that gave them the *status* of persons in open, notorious possession and occupation of land, claiming a sole dominion and ownership thereover adversely to all claimants.   Our answer declares that the entry of said company was under a grant from Mrs. Garraway.   The character of the company's works and nature of its occupation and purposes to be fulfilled showed that it was contemplated that its dominion and occupancy should be permanent.   No matter how the company entered, whether under deed unrecorded, or by parol grant or gift, or by parol license.   The company undertook and assumed to hold exclusively as owners, and adversely to any outstanding title.   If the complainant has a right to enter or to sue for, or, what is the same thing, exclude the possession of defendant by injunction, Mrs. Garraway her grantor could have done so more than ten years before the bringing of this suit.   The possession of defendant is claimed to be adverse under color of title dating back to latter part of 1868 or 1869, although color of title does not seem to be necessary.   Even if the original railroad company had no title, and this fact were fully known to Ames and Morgan and the other trustees, it would make no difference.   The mortgage-deed made by parties without title would nevertheless be a color of title to

a mortgagee entering under it, as well as to a purchaser from such mortgagee. *Love* v. *Love*, 2 Yerg. 288; *Welborn* v. *Anderson*, 37 Miss. 155. An occupancy under adverse claim for prescribed time by itself vests title without the aid of documentary title. Geore's Dig. 480, sect. 41, and authorities there cited; *Ladd* v. *Dubroca*, 61 Ala. 25 (29). The word "land" includes all corporeal hereditaments and interests therein. Code 1871, sect. 2935; Code 1880, sect. 15. The fact that the original entry was under a parol gift or grant makes no difference. This court has well said that such an entry, "though permissive and friendly in the popular sense, is hostile and adverse to the paper title in a legal sense, *i.e.*, it is an assertion of ownership in the occupant." *Davis* v. *Bomar*, 55 Miss. 671 (767); *McGee* v. *McGee*, 37 Miss. 138 (151). The assessment of damages in 1878 is *res inter alios acta*. In addition to the objection to the manner of proving the condemnation proceedings, the proceedings themselves were *res inter alios acta*, and were not material evidence against defendant for any purpose. The defendant was not bound by the judgment, because it was not a party to the proceedings. And if such proceedings could operate to fix an equitable lien on the property in favor of the owner as against a subsequent purchaser of the railroad, which we deny, it could not affect the defendant who holds the title of the first mortgage trustees, which dates back to January, 1869, with a default made and dispossession of the petitioner by the trustees in 1875, or nearly three years before the filing of the petition. In addition, the defendant holds the title of the second mortgagees to the first equity of redemption, which was deeded to the second mortgagees in March, 1869, the second equity of redemption remaining in the mortgageor, the original company. When the second mortgage was foreclosed, in 1873, subject to the first mortgage, this second equity of redemption was cut off, and all of the property, interest, and estate of the original company, *i.e.*, the said petitioner, was determined or merged with the first equity of redemption, then

vested in the trustees Gardner and Butler as purchasers at said foreclosure sale, they holding, as we have said, subject to first mortgage trustees, in whom was the legal title. This title so acquired by said trustees Gardner and Butler, and which was transferred by them to the company of second mortgage bondholders, was conveyed by the mortgage of said last named company to Washington A. Williams and other trustees, and through them was vested in defendant by the foreclosure of said third mortgage in May, 1880, so that both the title and possession of the property occupied by the railroad had, long before the inception of such procedings, been vested in persons holding adversely to petitioners. The title having passed from the petitioning company in 1869, and the possession of the property in 1873, how could its action, taken in 1878, affect either the title or nature of the possession of the property?   It seems to us that to ask the question is to answer it.   The mortgageor company could not, by a subsequent deed, affect the property of the mortgagee or place a superior lien upon it.   Every act of the mortgageor is subject to the previously acquired right of the mortgagee; he cannot bind the mortgagee by any contract, and even if he be in possession of the mortgaged property he can do no act prejudicial to the mortgagee's title.   1 Jones on Mort., sect. 703. And the title of the purchaser relates back to the time of the execution of the mortgage, and it does not matter to him what disposition the mortgageor may afterwards have made of the property.   2 Jones on Mort., sect. 1654.   And so thoroughly is the possession, as well as the title of the mortgageor, subservient to the rights and ownership of the mortgagee, that the disseisin of the mortgageor is a disseisin of the mortgagee. 1 Jones on Mort., sect. 789.   If the mortgageor could not, after the date of the mortgage, injuriously affect the title or right of the mortgagee or its purchaser, how could such mortgageor, by declarations or admissions, by proceedings of record or otherwise, affect such a right? Whilst the declaration or conduct of a grantor or assignor

made against his own interest before the grant or assignment may affect the title of the grantor or assignee, yet it is elementary law that such declarations or assignments made afterwards are of no effect. 1 Greenl. on Ev., sects. 189, 190; *Maney* v. *Jagger*, 1 Blatchf. 372 (376). But if a grantor make declarations against his title or interest before the grant, such declarations, as well as the grantor's conduct in regard to the premises, can be proved against, and are binding on, a subsequent grantee; and it is on this principle that we show the conduct of. Mrs. Garraway and her declarations made to the witnesses Jordon, Elmer, and Henly prior to her deed to complainant. *McKellip* v. *M'Illhenny*, 4 Watts, 317. The right and title of defendant and the estoppel of complainant: We now come to perhaps the most important question presented by the record. Presuming, for the sake of argument, that Mrs. Garraway executed no deed or other writing for the purpose of granting the property or right of way to the original company, and that the Statute. of Limitations or doctrine of stale demand does not by itself work a bar to the proceeding, we contend (1) that the complainant must wholly fail because of the estoppel resting upon her as the grantee and privy in estate of Mrs. Garraway; (2) that when by statute a corporation has the right to acquire lands against the will of the owner, to be occupied exclusively for permanent and well defined purposes, such as a railroad, although upon payment of compensation, no writing is necessary to vest a legal title or right of occupancy when the possession is delivered by the owner with the intention of granting the lands or its use to the purpose. The nature of the original entry on the lots in question which could be most favorable to complainant is that of an entry under a parol license. And it is this view which seems to have been taken by the counsel for appellant. And it is claimed that the parol license is temporary in its duration, is revocable at the will of the licensor, is personal to the licensee, and cannot be assigned to appellee, and is moreover so far personal to the licensor as not to be

binding on the vendee of the licensor, to wit, the appellant. And that, if it be otherwise, it is the attempt to convey by parol contract an interest in lands, and is void under the Statute of Frauds.   These doctrines, in the abstract and subject to exception, are mainly sound ; but they do not control the case at bar, which is, we submit, wholly without the pale of their operation and influence.   A parol license executed is irrevocable where the execution of the license has involved the expenditure of money on the faith of the license, or when the revocation of the license would subject the licensee to serious loss and damage.   This principle was fully recognized by Lord Ellenborough when a skylight had been erected, at an expense to the owner, under a license, notwithstanding by the Statute of Frauds the grant of such right must be by deed.   *Winter* v. *Brockwell*, 8 East, 308.   And so Lord Mansfield held, that where one tacitly licensed the erection of a building on his land he could not maintain ejectment on his title.   5 Term Rep. 556.   In one of the earliest cases in this country one Joseph Le Fevre gave to one Ashpenshade a parol license to lay certain water pipes across and under the land of said Le Fevre for the purpose of permanently supplying the tan yard of said Ashpenshade.   Several years after Le Fevre attempted to revoke the license and cut the pipes.   In a suit against said Le Fevre in an action of trespass *vi et armis*, by Daniel Le Fevre, the assignee of Ashpenshade, it was contended that the right to the permanent use of the water and of the land for pipes, etc., could only pass by deed.   But the court held that Ashpenshade had an exclusive right to the occupation of the route granted.   p. 243.   And that a parol agreement, whilst it might not absolutely pass the soil, was such an executed contract as, that on the ground of fraud, chancery would direct a specific execution, or restrain the defendant from disturbing the right. That such a revocation would be a fraud upon Ashpenshade, who had been put to expense, and that the fraud would be still greater on Daniel Le Fevre, a purchaser for valuable con-

sideration, with the possession of the grantor notoriously enjoyed for years. *Le Fevre* v. *Le Fevre*, 4 Serg. & R. 241, (244). A few years later the Supreme Court of Pennsylvania had occasion to again pass upon the question. The plaintiff, it appears, was the owner of a mill to which the water was conveyed by a race or flume over the land of defendant under a mere license given previously to the erection of the mill. The defendant sought to revoke the license and removed the flume. It was held that the license was irrevocable. Mr. Justice Gibson, with his usual vigor and clearness, said: "A license may become an agreement on a valuable consideration when the enjoyment of it must necessarily be preceded by the expenditure of money. And when the grantee has made improvements and invested capital in consequence of it he has become a purchaser for a valuable consideration. Such a grant is a direct encouragement to spend money, and it will be against all conscience to annul it. * * * Why should not such an agreement be decreed in specie? That a party be let off from his contract on payment of a compensation in damages is consistent with no system of morals. * * * In the case under consideration no objection to a specific performance can be founded on the intrinsic nature of the agreement, nor, having been partly executed, on the circumstance of its resting in parol; but it is to be considered as if there had been a formal conveyance of the rights, and nothing remains but to determine its duration and extent." The learned judge says: "The right under the license is commensurate with the thing of which the license is an accessory. Permission to use for anything that was viewed by the parties as a permanent erection will be of unlimited duration and survive the erection itself. * * * Having had in view an unlimited enjoyment of the privilege, the grantee has purchased by the expenditure of money a right indefinite in point of duration." *Rerick* v. *Kern*, 14 Serg. & R., 267. If a mill be considered permanent in its nature, how much the more should a great inter-state railroad be so construed. The parol license

to the railroad company for permanent use and occupancy is more binding, though somewhat analogous in its methods, to a dedication to public use.   No specific length of possession is necessary to constitute a valid dedication.   All that is required is the assent of the owner of the soil and the actual enjoyment by the public of the use for such a length of time that the public accommodation and private rights would be materially affected by a denial or interruption of the enjoyment.   Dill. on Mun. Corp. 494.   But we are not without authority in this State sustaining the view which we here present of the irrevocability on the grounds of equitable estoppel of a parol license executed.   See the case of *The New Orleans, Jackson and Great Northern Railroad Company* v. *Moye, Admr.*, 39 Miss. 374.   In all of the foregoing cases an equitable estoppel against the licensor was the ground upon which the license was sustained.   The court holding that to be a full answer to the plea of the Statute of Frauds.   And whilst the doctrine of estoppel works a complete bar to the claim of appellant, we do not think that it is necessary for the protection of the appellee that the doctrine should be invoked, — for we do not believe that a transfer of lands to a railroad or other public company authorized by statute to acquire the particular property by proceedings *in invitum*, that anything more is necessary than the designation of the property, and its actual occupancy by the company for the designated purpose, to vest in it, *eo instanti*, such a right as would be recognized by law, or at least entitle the company to compel the owner to a specific performance of the parol agreement, or to the execution of such documentary evidence of right as would protect it at law.   In other words, the statute takes the place of a deed, defining the extent of the company's rights, interest, and estate in the property, and giving notice to all the world of such interest and estate, as much so as would the records of the office of the register of deeds.   And we are not without reason and authority for this assertion.   If it were not for the constitutional provision requiring a prepayment of compensation, then

the legal right of entry and acquisition need have no other warrant or evidence than the text of the charter itself. *Compton* v. *Susquehanna R. R.*, 3 Bland. 386; *Rogers* v. *Bradshaw*, 20 Johns. 735 (Kent's Ch.); *Commissioner of Lowndes* v. *Bowie*, 34 Ala. 461 (467, 468); *Loweree* v. *Newark*, 38 N. J. L. 151; *Johnson* v. *Rankin*, 70 N. C. 550; *McIntyre* v. *Western R. R.*, 67 N. C. 278; *Raleigh R. R.* v. *Davis*, 2 Dev. & B. 451; *Cairo R. R.* v. *Turner*, 31 Ark. 494. This right to compensation is nothing but a right to a sum of money, notwithstanding its payment may be a condition precedent to the right of acquisition and possession, and may, therefore, be waived entirely, or its prepayment may be waived. If compensation is wholly waived the condition precedent is destroyed; if the payment by agreement is postponed it becomes only a money demand like any other debt. See *White* v. *County Commissioners of Norfolk*, 2 Cush. 361; *Cottrill* v. *Myrick*, 3 Fairf. 222; *Clement* v. *Durgin*, 5 Greenl. 9; *Mold* v. *Wheelcroft*, 27 Beav. 510; 33 Vt. 311; 39 Vt. 275; 42 Vt. 265.

CHALMERS, J., delivered the opinion of the court.

In 1869 or 1870 the New Orleans, Mobile and Chattanooga Railroad Company constructed their line of road upon and across two lots of land belonging to Mrs. Garraway in the town of Biloxi, without any precedent compensation or condemnation, or written license for so doing. In 1873 Mrs. Garraway sold the land to Mrs. Williams, the complainant in this suit, and transferred to her in writing her claim against the railroad company for damages or compensation. In 1877 the railroad company, or those into whose hands the possession and control of its property had passed, instituted in the mode and manner provided by its charter appropriate proceedings for the condemnation of a sufficient portion of Mrs. Williams' lots to suffice both for a right of way across the same and for depot grounds.

It was then, and had since its construction been, enjoying

the uninterrupted use and possession of a strip one hundred feet wide across said lot for right of way purposes, but stated in its petition that it had never been able to agree with the owner as to the compensation therefor, and now desired the condemnation of a strip two hundred and eighty-five feet in breadth, for right of way and depot purposes. To this petition both Mrs. Garraway and Mrs. Williams were made parties. The proceedings were carried through with the utmost regularity, all the requirements of the charter being strictly observed, and resulted in a judgment of condemnation of a strip of the desired width, measured from the centre of the track, " the compensation of the owner being fixed at $2,900." The report of the jury was upon motion of the railroad authorities approved, and the record of the proceedings filed and lodged in the office of the circuit clerk of the county. The company has never taken possession of or used in any manner the additional ground condemned for it, but has continued in the undisturbed enjoyment of the one hundred feet taken without condemnation in 1869–70.

It has never paid or tendered to the owner any compensation whatever.

This bill was filed in 1881 by Mrs. Williams to compel payment of the sum awarded her by the judgment of condemnation.

The defence of the company is that it entered upon the right of way across the lots by the parol permission or license of Mrs. Garraway in 1870, and that its right has ripened by subsequent possession and lapse of time into a perfect title, and that the proceedings of condemnation are not an estoppel upon it, nor even receivable in evidence against its present owners, because conducted by others than themselves, and were as to them *res inter alios acta*.

At the time when the railroad company entered upon the land it had already executed two mortgages upon its entire road-bed, property, and franchise, to secure the holders of its first and second series of bonds, and these mortgages provided

that upon default in payment of the bonds, the trustees, to whom was conveyed the legal title to the property for the purpose of securing payment of the bonds, should take possession of the entire property and sell the same under proper proceedings of foreclosure. By virtue of these powers the trustees in the second mortgage took possession of the road in 1873 and sold it to their *cestuis que trust*, the holders of the second series of bonds, in June of said year.

The purchasers at this sale held it for a short time only, and were displaced in January, 1875, by the trustees under the first mortgage, whose rights were superior to theirs. It was while it was in possession of these trustees (Raynor & Morgan, trustees under the first mortgage) that the condemnation of Mrs. Williams' land took place, and the present owners of the road hold by purchase from them in 1880, or rather under a foreclosure sale procured by them.

The condemnation proceedings were instituted and carried through in the original name of the company, to wit, the New Orleans, Mobile and Chattanooga Railroad Company, and the argument is that they were conducted by the original stockholders, after said stockholders had lost all right of property, as well as possession of the road, and after the corporation had assumed its present name, and that, therefore, said proceedings were *res inter alios acta* as to the trustees under the first mortgage, and as to the purchasers from them; and hence constitute neither an estoppel upon them, nor are receivable in evidence against them.

A moment's examination of the record shows that this position is specious and untenable. The proceedings of condemnation were instituted and carried through by James A. Raynor, who is shown to have been the active trustee in the first mortgage, and as such had the entire control and management of the road as the agent and representative of the bondholders protected by that mortgage, from 1875 to 1880. Roderick Seal, who is shown to have been the attorney of the road while it was thus in the hands of Raynor, conducted the

proceedings, and the chief engineer of the road during said period aided in the condemnation by furnishing the necessary maps. It is evident, therefore, that the procurement of the condemnation was the act of those under whom the present owners claim, and not of the original stockholders, whose corporate name was probably used because by that name only had the exercise of the right of eminent domain been expressly authorized by the State.

This conclusion disposes of the question of the Statute of Limitations, since the fact of condemnation, and the recitals in that proceeding, negative the idea of an adverse holding under claim of right, either before or subsequent to such proceeding.

It disposes, also, of the question of an entry under a parol license, since if we concede that the corporation can now set up a right outstanding in it at and before the suing out of the writ of *ad quod damnum*, the only evidence adduced in favor of such license is the testimony of three neighbors of Mrs. Garraway, to the effect that she had said to them in casual conversations that she had given, or intended to give, the company the right of way through her lots. Certainly such evidence as this is not sufficient to overturn the admission that the company had no right of way, evidenced by and expressly admitted in the condemnation proceedings.

What are the present rights of the parties, in view of the fact that the railroad company has never availed itself of the whole property condemned to its use, but has been since the condemnation, as it was before, occupying so much of it as is necessary for the right of way.

The doctrine, as ordinarily stated, is that by the confirmation of the report of the commissioners, a jury of inquest adjudging the necessity for the condemnation and fixing the amount of compensation, the right of each party becomes fixed and absolute, the one to the property, and the other to the money; and that there can be no subsequent abandonment by the party invoking the condemnation; so, that

60 Miss. — 45.

whether he chooses to use the property or not, he must pay to the owner the sum assessed.

A number of cases, however, take a different and we think a sounder view, namely, that inasmuch as it is not the judgment of confirmation that confers title, but only actual payment or tender of compensation, in cases where there has been no actual disturbance of the owner's possession it cannot be said that his right to the money is absolute.    The condemnation is, in a sense, always conditional ; that is to say, the court or officer in whom is vested the right of confirmation says to the party seeking it : " If you should pay, or when you shall have paid, the amount assessed, the property or the easement shall be yours."    Until, therefore, there has been such payment or tender the one party has acquired nothing and the other has lost nothing.    If the owner has suffered damage of any sort by reason of the proceedings, either in conducting them or consequent upon them, as in the destruction of structures or digging of earth in the one case, or the depreciation of values, the prevention of erections desired to be made, the incurring of expense or change of plans and losses of sales in the other, he will be entitled to full compensation therefor, but not to the specific sum found by the inquest.    Cases may arise where the condemning party will be estopped by some matter *in pais* from receding from the judgment rendered at its own instance, and this perhaps should always be the rule where it is impossible otherwise to fully compensate the owner.    When no such circumstances exist, and nothing prevents the attainment of complete justice, the party who has sought the condemnation should not be compelled to take land it does not want, nor the owner allowed to receive compensation for property in the possession and ownership of which he has never been disturbed.

. A number of cases illustrating the rights of parties where there has been an abandonment of condemnation proceedings before and after confirmation, are collected in the notes to Mills on Em. Dom., sect. 311, *et seq.*

Among those to be found there and elsewhere adopting the views here announced we cite 80 Ill. 482; 13 Cal. 307; 10 Md. 544; 27 Vt. 39; 48 Ill. 144; 10 How. (U. S.) 395. The facts of this case-are peculiar. Our researches have led us to none exactly analogous. Four years intervened between the condemnation and the filing of this bill, during which no entry by the corporation has been made upon any other land than that theretofore and now used as a right of way; but as to so much as is used for that purpose, the corporation has from the inception been a trespasser, so far as this record discloses. There was no separate estimate made of the value of the right-of way, but the sum assessed was in gross for all that was then desired, both for the right of way and for depot purposes.

We think that the company should be compelled at once to elect whether it will now take the whole amount of land condemned, or relinquish all claim to any more than the hundred feet used as a right of way. If they elect to take the whole, the complainant will have the right, in view of the long time that has elapsed, to say whether she will take the sum assessed in 1877, with interest, or demand that a new valuation shal now be fixed by the court, after it shall have been advised by reference to a commissioner appointed to ascertain that value. If the corporation shall elect to retain the right of way only, a commissioner should be appointed to ascertain its value both at the time when the property was first invaded and at the time when the account is taken, with the right in complainant to elect whether she will take the present value or the original value with interest.

Complainant by her bill having recognized the validity of the former proceeding of condemnation, and submitted her rights in the property to the jurisdiction of the Chancery Court, we deem it unnecessary to issue another writ of *ad quod damnum*, and the more advisable to settle all the rights of the parties in this suit.

We allow the right of election as to the amount to be taken

to the corporation, because, though trespassers, it seems probable that they were not wilfully so, and because the complainant and her vendors, with full knowledge of all the facts, have for many years permitted the trespass to continue without taking any steps to prevent it. While, under these circumstances, complainant is entitled to compensation for so much of her land as is actually used, she is entitled to nothing more. Ordinarily interest upon the assessment is not allowed the owner when possession remains with him, but in this instance there has been partial possession all the while in the corporation, and as this must have operated in connection with the judgment of condemnation to some extent as a hindrance to the enjoyment and power of sale of the whole, we think interest should be paid in the manner indicated above.

The decree dismissing the bill is reversed, and the case remanded to be proceeded with in accordance with the principles announced in this opinion. When decree shall have been rendered, a reasonable time should be allowed to pay the sum decreed, and the cause should be retained until the same is paid, so that its payment may be enforced by execution, or if necessary by injunction, restraining defendants from running their trains over complainant's land until the decree is complied with.