Mr. Justice Hag-nb®.
delivered the opinion of the Court:
It is proper to consider first the last objection of the series, which denies entirely to the General Government the power to condemn property for public uses within the District of Columbia; since if this position is well taken it will render unnecessary the examination of any other of .the constitutional difficulties relied on by the respondents.
This objection is based upon an alleged reservation by the State of Maryland, in the Act of 1791,' Ch. 45, Sec. 2, of any authority to exercise the right of eminent. domain by the United States, within the District of Columbia.
It needs no citation of authority to show that the right to take private property for public uses in exercise of the right *116 of eminent domain belongs inherently to every nation justly calling itself independent and sovereign — that the power is so far reaching that it extends in case of necessity to the right of disposing of all the wealth of the country — that this authority belongs to every State in the Union — that it existed in the General Government independently of and before the adoption of the Fifth Amendment of the Constitution, which only imposed a limitation to its exercise; and that, (in the language of the Supreme Court, in Cherokee vs. Kansas R.R., 135 U. S., 667,) “all lands held by private owners everywhere within the geographical limits of the United States, are held subject to the authority of the General Government, to take them for such objects as are germane to the execution of the powers granted to it, provided they are not taken without just compensation being made to the owner.”
In this declaration of the universal powers of the Government, there is no foot of land from the Atlantic to the furthermost limits of the Aleutian Islands, which is excepted. But if the contention now under consideration be correct, this District, the seat of Government and centre of the power whose pulsations are felt to its remotest frontiers, is alone exempt from its influence. It would result, that if the Government in anticipation of war, believed it expedient or necessary to the public welfare to possess itself of an advantageous strategic point within this territory, placed by the Constitution under its exclusive jurisdiction, and fortify it in advance of the threatened danger, the avarice or disloyalty of the owner could absolutely prevent its acquisition.
' Of course Maryland now can have no such right in the ceded territory ; and hence the private property here would be held by a tenure different and superior to that known, probably, in any civilized country.
In support of a proposition leading to such astonishing results the strongest arguments should be presented.
That the Government would have consented to take possession of the District when ceded by Maryland, hampered by any such condition, is incredible. There were too many *117 offers of territory from different States for its seat of Government to render it important for the United States to accept any offer accompanied by any such harmful limitations.
After the Congress had been besieged by a mob of soldiers in Philadelphia, it became convinced that the seat of Government should not be located in a large manufacturing or commercial city.
The different States at once became competitors for the establishment of the capital within their borders, and in 1783, Maryland offered Annapolis to the Congress of the Confederation, accompanied by the pledge of a large sum of money for public buildings ; and from that time it was most anxious to secure the location within its own territory.
Nor could the United States have bound itself to any such condition, however distinctly set forth in the act of cession-
The exercise of the right of eminent domain by a sovereign cannot be the creation of grant or compact. It inheres in the existence of an independent Government, and comes into being eo instanti with its establishment, and continues as long as the Government endures. The United States did not derive the right to exercise it in Uouisiana from France, or in Florida from Spain, or in California from Mexico, or in Alaska from Russia; the right was coeval with its proprietorship as sovereign. And the United States could no more have abandoned the exercise of this right within the District of Columbia than it could have bound itself not to declare war, or levy taxes, without the assent of the Uegislature of Maryland.
But in our opinion no such relinquishment of power can be deduced from the legislation referred to. As soon as the promulgation of the Constitution had disclosed the requirements of the United States as to the territory for the seat of Government, the State of Maryland by chapter 46, of 1788, required its Representatives in Congress to cede to the Congress of the United States any district in the State not exceeding ten miles square which Congress might fix upon and accept for that purpose.
*118 The contest respecting the location of the required territory was acrimonious and prolonged, and it was not until July, 1790, that Congress accepted portions of the lands tendered by Maryland and Virginia, making together the ten miles square. After the exact boundaries selected had been ascertained and promulgated by the President, on the 23d of December, 1790, Maryland passed an act giving authority to condemn lands in the ceded territory, if necessary, for the erection of the public buildings. By proclamation of President Washington, an amendment was made in the former survey ; and thereupon the principal proprietors of the Maryland portion of the territory, executed an agreement by which they undertook to convey their lands to the President or to such person as he might select, in trust for the use of the city ; and these conveyances were executed to Messrs. Beall and Gantt, the selected trustees. It then became requisite that Maryland should recognize the specific appropriation of the reduced amount of its territory in lieu of its former offer of the entire ten miles square, and for this and other purposes connected with the new territory, the Act of 1791, Chap. 45, was passed December 23, 1791. The first section recited the proclamations ; the conveyances to Beall and Gantt as trustees; that some of the proprietors in the villages of Carollsburg and Hamburg, as well as some of the proprietors of other lands had not, from imbecility and other causes, come to any agreement ; but that as a great proportion of all had agreed to the terms recited, the President had directed a city to be laid out with boundaries designated in the act, etc., and it was thereupon enacted in Sec. 2 :
“That all that part of said territory, called Columbia, which lies within the limits of this State, shall be, and the same is hereby acknowledged to be forever ceded and relinquished to the Congress and Government of the United States,” in full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon, pursuant to the tenor and effect of the eighth section of the first Article of the Constitution of Government of the United *119 States. Nothing more explicit could be desired, unless an enumeration of the rights ceded was to be attempted. '
But it is argued that the following proviso effectively contains the limitation contended for: “Provided, That nothing herein contained shall be so construed to vest in the United States any right of property in the soil, so as to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuáis to the United States.”
But it is clear the power to exercise the right of eminent domain within the District could not be dependent for its creation or consummation upon the words of the act. For as it was an inseparable incident of independent sovereignity, proprio vigore it was already applicable to this territory even while it remained a part of Maryland, as it was to all the other lands within the bounds of the Union. Such a power would not therefore be included as one of those ‘ ‘therein contained” in the statute of 1791, Chap. 46. '
But the words in the proviso doubtless were considered necessary and were inserted only to protect private rights of property in such proprietors as had ‘ ‘not come to any agreement,” because, as the act had already recognized, the agreement had not been signed by all, but only ‘‘by a very great proportion of the landholders,” and that this action of the majority had induced the President to lay out the city without waiting for the assent of the others; the right of the minority to refuse the terms offered by the authorities was thus properly recognized and secured. But this was very far from a purpose to declare that in case those owners should not assent to the terms proposed, the United States should not exercise the sovereign right of condemning the property for the public use.
If the question otherwise admitted of any doubt, that would be removed by a consideration of the 24th section of the same act, which authorized the Commissioners referred to in the act to issue a process directed to the sheriff of Prince George’s County to summon five freeholders to value the land of such persons as still refused to accept the terms agreed to by *120 the other proprietors; and declared that upon payment of such valuation, the said lands' should be vested in the Commissioners for the use of the city; and the last section of the act repealed the former law of 1790, which for two years had authorized the condemnation of lands for public buildings. It is true the machinery to be used for this condemnation was that of the State, as the United States had not yet organized the local government in the new territory; but the United States, in making condemnations may use any proper agencies, whether of the several States or such as may be devised by itself for the purpose.
It is inconceivable that the State of Maryland, while specially providing in the act of 1791 for the condemnation of property in the District, as it had previously done by the act of 1790, should have introduced the' proviso referred to, with the purpose of withholding from the General Government the power to do that which every independent nation must enjoy as undeniably as it possesses the right to coin money or build ships of war. This Act of 1791 was recognized in supplementary acts passed in 1792 and 1793.
We have been referred to the case of the Chesapeake and Ohio Canal Co. vs. Union Bank, 4 Cranch, 757, as recognizing in some way the construction of the proviso contended for. It is true Mr. Key, who was of counsel in the case, presented this contention, but it is equally true that the judges who sat in the case unanimously overruled it. The argument of counsel, however eminent, can scarcely prevail over the decision of the court. 3 Cranch C. C., 600, contains the report of a similar appeal for a condemnation in behalf of the canal company of Mr. Key’s own land, in which no such point was made. The contention, repeated in the present case, that constitutional rights formerly possessed by Maryland, unless expressly enumerated, did not pass by the cession is answered by the decision in Alexandria Canal Co. vs. City of Georgetown, 12 Peters, 94, where it was held that the bottom of the Potomac, though not mentioned in the act of cession, passed to the -United States, without express grant, so as to *121 entitle it to allow to the canal company, the privilege of building its piers in the bed of the river.
The Court of Appeals of Maryland, in Washington Aqueduct vs. Great Falls Manufacturing Company, 21 Md., cites this case with approbation, thus evincing the adoption by the Maryland courts of the principles of the decision.
But the very Chesapeake and Ohio Canal cases demonstrate that more than sixty years ago the Government regarded itself as entitled to exercise, and did exercise, the right within the District. The charters granted by Virginia and Maryland authorized the construction of the canal, with power to condemn requisite land along its route ; but its arrival at tidewater depended upon the assent of Congress, which was granted by the statute in 1825, though without an express authorization therein to the company to make condemnations. A large number of condemnation proceedings were conducted before our courts in the name of the company, which resulted in the acquisition by the canal of the parcels of land within the District required for its purposes. The proceedings could only have been prosecuted under the authority of the United States ; and the Government could not have empowered the Canal Company to conduct such proceedings in its own name, unless it possessed the power itself; since it could not communicate to the company an authority not possessed by the Government. The power given by Congress, from time to time, to the District of Columbia and to railroad companies to 'make condemnations, in their respective names, is equally evincive of the understanding of Congress that the power resided in the United States.
The power has also repeatedly been exercised in this District in the name of the United States without question. Thus, in 1858, (n Statutes, 263,) condemnation proceedings were authorized to acquire lands within the District for the Washington aqueduct, and numerous awards were made by juries in that year, and confirmed by the Circuit Court, in cases instituted in the name of the United States, and no objections were interposed by counsel upon the ground now referred to.
*122 Under the Act of 1872, Ch. 140, (17 Stats., 83,) condemnations have twice been made in the name of the United States, to enlarge the grounds of the Capital, by commissioners appointed by this Court — the last in 1878. The same statute was invoked in 1857 to acquire the north embankment of the Aqueduct Bridge in Georgetown, in the name of the United States, under the act of that year (Vol. 24, 85).
These Acts of Congress are referred to as evidence of contemporaneous legislative construction, by the Government and acquiescence in their enforcement' by all defendants, for so long a period that their correctness should only be questioned upon cogent necessity. Stat. of Maryland, 2 Gill, 497.
More recent instances of the exercise of this power in the name of the United States are shown in the Act of 1886, (24 Stat., 13) authorizing a condemnation by a jury of seven of land for the Congressional Uibrary; in the Act authorizing the Secretary of the Treasury to purchase or acquire by condemnation, as this Court should direct, additional ground for the Bureau of Engraving and Printing (25 Stats., 511); in the Act of 1890, June 55, (1 Sess., 51 Cong.), authorizing the Secretary of the Treasury to acquire by condemnation a square of ground in the city for the purposes of a city post office, by Commissioners appointed by this Court; and in the Act of August 30, 1890, (1st Sess., 51st Cong., 413), authorizing the board therein named to acquire by condemnation additional lands for the use of the Government Printing Office, through three Commissioners to be appointed by this Court.
Indeed, it is difficult to find a power of Government whose exercise in this jurisdiction is more amply allowed and justified by statute and practice of the Government than this, the constitutional existence of which has been so positively challenged. We have been thus at what may appear to be needless pains to examine the objection, because if well founded it was high time it should be speedily acknowledged, that timely constitutional measures might be adopted to rescue the essential rights of the Government in this asserted derelict territory from so exceptional a condition. Fortunately *123 we are entirely satisfied the contention is wholly unfounded.
'The language of Chief Justice Cranch in Chesapeake and Ohio Canal Co. vs. Key, 3 Cr. C. C., 605, is so well expressed and forcible that it deserves to be recalled in any discussion of this subject in this tribunal:
“The public right is as much common right as the individual right. This public right, is not a power exercised merely because the sovereign power cannot be controlled, and therefore in derogation of common right, but it is a constitutional power, primarily assented to by the people themselves, in their original primitive sovereignty, not applicable to any particular individual, but extending equally to all, and creating a lien upon all property, into whose hands soever it may come. The contemplated canal is intended to be a great highway, and no man can be ignorant that he holds his lands always subj ect to the right of the public to make a highway through it, whenever the great interests of the nation or of the State may require it. ’ ’
2. It is next objected that the law is unconstitutional because Congress thereby designated the Chief of Engineers of the Army and the Engineer Commissioner of the District, as members of the Commission appointed by the law to select land for the park, and to perform various duties with respect to that function, whereas it is insisted the President and not Congress has the sole right to appoint officers to discharge such duties.
In the consideration of this and the other objections made to the constitutionality of the law before us, we have had in mind the importance of the inquiry; the caution with which even the Supreme Court approaches such objections to be heard only by a full bench; and its refusal in any but a clear case by sustaining them, to impute to the Eegislature an infraction of the Constitution. Justice Story in pointing out the true meaning of the principle of the separation of the powers of the Government (which is not declared in the Federal Constitution in direct words, as in most of the State Constitutions, but is enjoined practically by assignment of *124 the different powers to the three departments), declares “we are to understand this rather in a limited sense. It is not meant -to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of communication or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of thesé departments should not be exercised by the same hands which possess the whole power of either of'the other departments, and that such exercise of the whole would subvert the principles of a free Constitution.” 2 Story on Const.; 525.
Such an entire separation is never found in practice under any Constitution, however positively it may be commanded. The Executive in approving laws is really acting as a part of the legislature, and the President and the legislature constantly decide many questions judicial in their character. The legislative and Judicial branches of the Government have the right to make appointments to many offices. Indeed, the power of appointment to office is not a function so intrinsically executive that it necessarily belongs, to that department; although its nature is executive, whether it be exercised by a Court or by the legislature, or the President. Baltimore vs. Police Board, 15 Md. 455.
Judge Cooley (115 Const. Tim.) makes this comment on the subject before us:
1 ‘The authority that makes the laws has large discretion in determining the means through which they shall be executed, and the performance of many duties which they may provide for by law they may refer either to the chief executive of the State, or at their option, to any other executive or ministerial officer, or even to a person specially named for the duty.1”
In conformity with this principle, Congress has in the most marked instances in a multitude of statutes, specially entrusted the performance of particular duties to officials already charged with duties of the same general description. The most important of these instances are those affecting the judiciary. Among them are the early Act of 1802, which directed the justices of the Supreme Court to sit in the Cir *125 cuit Courts; and the recent law of March 3, 1891,' which authorizes the justices of the Supreme Court and the existing circuit judges, to sit in the newly established 'Circuit Courts of Appeals, with the District judges and the newly created Circuit judges.
It would be endless to refer to the cases at hand in which this has been done. By various provisions of the Revised Statutes of the United States and of the District the Chief of Engineers is entrusted with a variety of duties, among them the charge of the public buildings and grounds in the District of Columbia, of the Washington Aqueduct, of the electrical apparatus of the rooms in the Capitol, of suits respecting the obstruction of streets, etc.
In the recent legislation of Congress the requirement that particular officials shall perform designated duties is frequently repeated. As in 25 Stats., 523, the Chief of Engineers is required to take charge of the construction of the Congressional Dibrary. By the Act of August 30, 1890, the Secretary of the Treasury, the Public Printer, and the Architect of the Capitol are empowered to take measures to acquire additional lands for the Government Printing Office; and similar provisions might be indefinitely cited.
The duties required of these two Army officers in this law are in no degree foreign to their usual and appropriate sphere. Surely they are more germane to the functions of the Chief of Engineers than the control of electrical lines; and to those of the engineer member of the Board of District Commissioners than the granting of liquor licenses, the regulation of hackney coaches, or the appointment of policemen. If the duties of the Park Commission are really of the multiform and inconsistent character represented in the argument it is difficult 'to imagine how one set of men could be found able, constitutionally or mentally, to perform them all.
If these Army officers are now serving as members of the Park Commission at the seat of Government, it must be assumed they are so acting with the assent and under the orders of their commanding officer, the President, who must *126 be aware of their present occupation. Besides, as the majority of the Board is empowered by the law to act in all case's, the three civilian members might legally discharge the duties of the Commission independently of the two army officers, if their appointment were irregular.
3. It is next objected that the statute is invalid because by it the President is entrusted with certain duties connected with the proceedings to acquire the park.
It is insisted first, that these duties are judicial in their character, and cannot properly be devolved upon the Executive; and next, that his co-operation in the proceedings in the' manner provided, destroys their essential character of impartiality.
There can be no doubt the proceedings to condemn lands in exercise of the right of eminent domain are quasi-judicial in character, and have been held as included within the designation of trials at law. But we do not see that the statute enjoins upon the President or allows him to participate at all in those trials.
The first duty devolved upon him by the law is the appointment of the Park Commission, a function which is not obnoxious to either branch of this objection.
In the first and second paragraphs of the third section this Commission is authorized to negotiate for the purchase of the lands by agreement with the owners within thirty days after the filing of the map, at a price to be approved by the President.
As this provision applies entirely to a purchase by agreement, and the defendants all refused to sell, its force as to them may be considered as exhausted, and the provision as obsolete, and it cannot possibly operate to their disadvantage. In the concluding paragraph of the third section, authority is given to this Court for the appointment of three commissioners of appraisement, to ascertain and assess the value of the lands and return the appraisement to the Court. When this duty has been performed by the commissioners of appraisement the “quasi-judicial proceeding” or “trial” is at *127 an end; and nothing more remains to be done by those commissioners with reference to that particular finding. Up to that point the President has nothing whatever to do with the proceeding, and he has neither the right nor the opportunity to interfere in any degree with the action of the commissioners in making their valuation.
It is only after this quasi-judicial act has been accomplished by the assessors that the President’s function comes into activity ; that duty is thus defined in the law, ‘ ‘ and when the value of such lands are thus ascertained and the President of the United States shall decide the same to be reasonable, said value or values shall be paid to the owner.”
Is this duty thus devolved upon the president, in the sense of the Constitution, judicial ? We have seen it does not derive such quality from any connection with the deliberations of the jury, since with those he has absolutely no more to do than the treasurer who has to pay the amount of their valuation.
What he is thus empowered by the statute to perform is precisely what every corporation instituting condemnation proceedings has a right to do, irrespective of statute, after the jury has returned the award, if it shall decide the valuation is riot reasonable; namely, to decline to take the property at all.
This is perfectly well settled law, and it scarcely needs the citation of authorities. B. & P. RR. vs. Nesbit, 16 Howard, 396; Stewart, vs. Mayor of Balto., 7 Maryland, 516; Graff vs. Mayor of Balto., 10 Maryland, 552.
The condemnation, until the acceptance of the award and payment of the money, is merely tentative, and the right of abandonment is subject only to the duty of reparation to the property owner, for any damage occasioned him by the institution of the proceedings.
This undoubted right would not be at all impaired, if the existence of its right, on the part of a corporation to refuse to take the particular property should happen to be declared in the Act authorizing the condemnation. The acknowledgment in the Act of a plain right could not destroy it.
*128 The same right of abandonment resides in the United States in the present case ; and that right also cannot be affected by the provision in the act authorizing the United States to exercise it by declining to take the property unless the President shall decide that the valuation is reasonable.
Where the United States is promoter* of the condemnation, it must act by an agent in deciding whether to accept the award ; and Congress doubtless thought it wisest to devolve this duty upon this high official whose position in itself would seem to furnish a guarantee of perfect impartiality and of independence in the discharge of the duty assigned.
The legality and propriety of such a provision in the law are well explained by the Supreme Court in the case of Garrison vs. City of New York, 21 Wall., 204, where an award against the city for property taken for public use had been set aside by the court under the authority of a special statute authorizing a rescission of a former order of approval and a re-examination of the award. Mr. Justice Field there said:
‘ ‘ The proceeding to ascertain the benefits or losses which will accrue to the owner of property when taken for public use, and thus the compensation to be made to him, is in the nature of an inquest on the part of the State, and is necessarilj'- under her control. It is her duty to see that the estimates made are just, not merely to the individual whose property is taken, but to the public which is to pay for it. And she can to that end vacate or authorize the vacation of any inquest taken by her direction, to ascertain particular facts for her guidance, where this proceeding has been irregularly or fraudulently conducted, or in which error has intervened, and order a new inquest; provided such methods of procedure be observed as will secure a fair hearing from parties interested in the property.”
“Nor do we perceive how this power of the State can be affected by the fact that she makes the finding of the Commissioners upon the inquest subj ect to the approval of one of her courts. That is but one of the modes which she may adopt to prevent error and imposition in the proceedings.”
*129 The President is given by the act no powei to take the property against the verdict of the assessors; he is only vested with the authority either to acquiesce in their judgment or to decline to accept the property; the latter course certainly should not be disapproved of by such of the proprietors as really object to the taking of their land for the Park.
Such authority has been constantly given to the President by Congress without any suspicion that it was in such wise judicial that the Executive could not constitutionally execute it. The acts of Maryland and Virginia and of Congress, about the close of the last century, committed to the President many duties connected with the location and acquisition of the District of Columbia and the building regulations of the new city, which were much more obnoxious to such a charge; but they were performed without criticism by the courts.
After establishing the boundaries of the District, the President changed them by proclamation so as to embrace territory below the mouth of the Eastern Branch. The plans for laying out the' lands were declared to be such ‘ ‘ as the President should approve,” the public appropriations or parks were designated by him ; and most of the building regulations in force here to-day were promulgated by General Washington.
Repeatedly provisions of law in statutes have been suspended-because of discretionary powers given by Acts of Congress to the President to suspend their operation if he should think the public interest required such action. Such were the cases under the Mexican and American Joint Commission. By subsequent statute it was declared that if the President should be of opinion that the honor of the United States, the principles of public law, or considerations of justice and equity required that the awards made by that joint commission in the cases of Weil and Ea Abra Co. should be re-opened, he was authorized to withhold payment of those awards. His course in concluding to do so was approved by the Supreme Court in Frelinghuysen vs. Key, 110U. S., notwithstanding the contention that it was inexcusable contempt of inter *130 national awards; and it was further declared by the Court that the President would have the right to act as he did in the absence of a statute. The question came up again in U. S. ex rel. Boynton vs. Blaine 139, U. S. 306, where the same doctrine was announced. In U. S. ex rel. Warden vs. Chandler, Secretary of the Navy, 2 Mackey, 527 this Court justified the Secretary, under the orders of the President, in refusing to expend $200,000 to purchase land at Chiriqui for a naval station, under an act of Congress authorizing him to establish stations and depots for coal at the Isthmus of Panama. Under the recent tariff and copyright acts discretionary powers were committed to the President which might equally be called judicial, in that their performance involved the exercise of judgment and grave discretion. The Presidents have approved and disapproved, as they saw fit, from the beginning of the Government, the sentences of courts-martial, thus directly exercising wbat would have been properly called judicial power if exercised by a reviewing court. Since the argument of this case, the President has by proclamation declared that the United States has accepted the property in this city condemned for a city post-office, under a provision of the Act of June, 1890, similar in terms to the language of the act before us. A similar requirement appears in the Act of August 30, 1890, authorizing the acquisition of land for the use of the Government Printing Office ; and the provisions of that act are made applicable to all future proceedings for taking property for public use in this District.
4. The constitutionality of the law is assailed, finally, upon the ground that the amount of compensation to be paid for the land needed for the park is therein limited to $1,200,000, the sum appropriated by the act. It is argued that this provision is an admonition if not a command given in advance to the appraisers, that it would be unlawful for them to assess the aggregate cost at a larger amount than that named in the statute, and that they will not be considered as having found a just compensation if it exceeds that sum.
The words of the act afford an answer to these positions. This court is authorized and required to ascertain and assess *131 the value of the land “by appointing three competent and disinterested commissioners to appraise the value or values thereof, and to return the appraisement to the court.” The duty required of the appraisers is to appraise the value of the land and return to the court an appraisement; not differing from their belief of its value, but in accordance with that belief. If they believe the aggregate value exceeds the amount named in the act, how can they escape the obligation to say so?
If the law limited the expense to $10,000,000 would the appraisers be justified in valuing the land up to the entire amount merely because that limit was named in the law? or if the sum named was $10,000 could it be supposed they would conform their valuation to what they plainly saw was an inadequate sum.
We do not agree to the suggestion of defendant’s counsel that the entire appraisement and award must be a unit. On the contrary, the adjudication of the value of each property must be separate. Whether the amount of the separate appraisement of the reasonable values of the several properties may exceed or may fall short of the sum appropriated, the appraisers must equally return what they believe is their just value, as competent and disinterested Commissioners are bound to do. The idea suggested that the $1,200,000 will be inserted in the precept issued to them as the limit of their finding, is altogether imaginary.
The citation from Cooley, 563, adduced to show that the legislature cannot fix the amount of the valuation in advance has no application to a case like the present. In the Charles River Bridge Co. vs. Warren, 11 Peters, 571, relied on by Cooley for the statement, Justice McRean declared that the provision in the charter of the new bridge company requiring it to pay a definite sum per annum to the old company as compensation for the injury to its property, was an inadmissible mode of attaining the end designed; because, as expressed by him, ‘ ‘ By this provision it appears the legislature has undertaken to do what a jury of the country only could constitutionally do — assess the amount of compensation to which *132 the complainants are entitled.” The same reason is given for the use of a similar expression in Pa. R. R. vs. B. & O. R. R., 60 Maryland, 269. There the legislature authorized any railroad to use five miles or less of the track of any. other railroad, upon making compensation for its use at a rate per pile fixed in the statute itself. It was in reference to this exaction the court said, ‘ ‘ The legislature in exercising the right of eminent domain cannot, in the law itself, fix the compensation to be paid. Such compensation, in case of disagreement between the parties, must in this State be awarded by a jury.” But in the case at bar the statute appoints a tribunal of three Commissionsers, the acknowledged legal equivalent of a jury in condemnation proceedings, and by that Commission alone is the just compensation to be appraised.
That the naming of a fixed sum in the act can operate as a limitation to prevent Congress from increasing it, if it should think proper, is of course, incorrect, and not justified by the course of Congress in other cases.
By the Act of 1886, Chap. 50 (29 Stats., 13), a large sum was appropriated to acquire land for the Congressional library Building. The awards for the land found by the jury overran that sum, and a subsequent appropriation was made to complete the payment.
By the Act of 1888, Chap. .1069, a designated sum -was appropriated for the purchase of land for the use of the Bureau of Kngraving and Printing. It was represented to Congress that the award would probably exceed that amount, and at the last session, by Chap. 542, a further sum was appropriated for the purpose.
We, of course, have no thought of intimating any likelihood that such excess of valuation may occur, or that the appraisers can lose sight of the double responsibility that must weigh upon them with equal weight — the duty to protect the people among whom they live from excessive exactions— and the equal duty to allow to the owners a just value for their lands. We have onty spoken thus to show that the act has not left the land owners in the helpless predicament *133 stated. That the Government is bound to make just compensation for whatever it shall take from the individual is undoubted; and in the words of the Supreme Court in 124 U. S., 596, “It is to be assumed that the United States is incapable of bad faith, and that Congress will promptly make the necessary appropriations whenever the amount of compensation has been ascertained in the mode prescribed.” We believe the citizen may well confide in the ultimate justice of his government — the most generous, as it is the happiest and most powerful on the earth.
5. The further objection was presented by the answer, though not argued at length; that the appropriation of these lands for the purposes of a public park, was not “.a public use,” in the sense of the Constitution.
It must be conceded that in a case like the present the Legislature is the only competent judge to decide that point.
-Upon all the authorities it is also well settled that the condemnation of land for the purpose of a park is within the principle.
If no other ground existed for its exercise, we think the duty of the Government to obtain control of the entire course of Rock Creek within the boundaries of the District, to prevent its waters from being polluted by the offal of slaughterhouses and of disgusting factories, bringing their abominations into the midst of the city to poison and infect the air, would afford sufficient justification for this attempt to save the community from such dangers.
The objections being all overruled, the Court will proceed to act, as requested by the petition.